UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------

TINA LYPRINCE HALL, et al., :
:
      Plaintiffs, : CASE NO. 1:15-CV-01070
:
  v. :
: OPINION & ORDER
SHOE SHOW, INC., : [Resolving Doc. 13]
:
      Defendant. :
:
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On May 6, 2013, Plaintiff Tina Lyprince Hall fell while trying on shoes at SHOE DEPT. ENCORE, a shoe store operated by Defendant Shoe Show, Inc. Plaintiff Hall and her husband, Plaintiff Rynell Armstrong, brought a negligence action against Defendant.[1]

Defendant moves for summary judgment.[2] For the following reasons, the Court **GRANTS** Defendant's motion for summary judgment.

**I. Factual Background**

On May 6, 2013, Plaintiff Tina Lyprince Hall entered SHOE DEPT. ENCORE shortly after it opened to look for a pair of high heel shoes for her upcoming nursing program

---

[1] Doc. 1. The case is in federal court on diversity jurisdiction.
[2] Doc. 13.

-1-

Case No. 1:15 CV 01070
Gwin, J.

commencement ceremony.[3] Plaintiff Hall took her four-year old daughter with her to the store. While trying on a pair of high-heel shoes, Plaintiff Hall fell and sustained injuries.

Defendant Shoe Show, Inc. operated SHOE DEPT. ENCORE, also known as Store 597. The store is located in the Chapel Hill Mall in Akron, Ohio and is approximately 27,000 square feet. The store has the third-highest sales volume of the approximately 1,500 Shoe Show stores around the United States.[4]

Evidence suggests Store 597 was well operated and well maintained. On January 17, 2014, an auditor commented that Store 597 "looks so good neat clean organized more that [sic] ready for scan/taging [sic] on boxes is the best I have seen in a log [sic] time store room very organized."[5] The store was audited again approximately two weeks before the incident at hand. With that audit, the auditor commented, "store was very neat clean and organized store employees are very well trained and customer service done 100%; best looking encore I have seen lately."[6]

At the time of the incident at hand, John Bestvina served as the store manager of Store 597. Bestvina testified that he strictly enforced all of Shoe Show's store policies and required Store 597's employees to comply with those policies.[7] Those policies included a number of tasks upon store closing every night. The policy states, "SHOE SHOW's policy is that every store must be straightened at night. We must be ready for business the next day. Every store must be

---

[3] Doc. 13-5 at 84.
[4] Doc. 13-2 at 16–18.
[5] Doc. 13-1 at Ex. D.
[6] *Id.* at Ex.C.
[7] Doc. 13-1 at 2.

Case No. 1:15 CV 01070
Gwin, J.

straightened and filled during the day."[8] The policy then enumerates ten specific tasks including, "carpet vacuumed."[9]

Another employee working on May 6, 2013, Melinda Ohler, testified that she arrived at the store sometime between 9:00 a.m. and the 10:00 a.m. opening and that she would clean the store upon arrival every morning.[10]

Inside the store, multiple carpeted display aisles showcase shoes. After browsing shoes, Plaintiff Hall decided to try on a shoe with a 3-5 inch wedge heel.[11] Defendant Shoe Show has a policy of only displaying one shoe for certain shoes. This one shoe practice is an anti-theft measure to protect shoes that are at the highest risk of theft.[12] When trying shoes, customers must ask for the other shoe in the pair if they desire to try both shoes.

Plaintiff Hall decided to try on the one right shoe that was available and kept her flip flop shoe on her left foot. Plaintiff Hall put on the shoe while sitting on a bench. After putting the shoe on, Plaintiff Hall stood up to look at the shoe in the mirror. Plaintiff Hall testified that she then fell due to a foreign object under the wedge heel. Plaintiff Hall testified,

> When I get into my standing position, I turn towards the left to go to the viewing mirror that's on the back wall. I make a couple of steps when I step down, and when I stepped down I feel something up under this wedge. Instantaneously when I stepped down on the foreign object, it made me sway from left to right motion as in losing my balance, becoming imbalanced at this point, and because I'm in between the area of the mirror and the shelf, my first instinct is to reach out and

---

[8] The full checklist reads, "1. Racks full (no empty holes) 2. Shoes styled 3. Accessories and handbags (full and styled) 4. All displays full 5. No shoes on floor behind checkout 6. Windows/mirrors cleaned (ledge wiped) 7. Carpet vacuumed 8. Sidewalk swept (recheck in the morning) 9. Heat turned to 55/air conditioning turned to 80 10. Sale tables neat. *Id.*
[9] *Id.*
[10] Doc. 13-6 at 9–10.
[11] Doc. 13-5 at 51.
[12] Doc. 13-1 at 19.

Case No. 1:15 CV 01070
Gwin, J.

> try to grab ahold of something to break my fall because at this point it's obvious I'm going to fall and I'm trying not to fall, so I reach out to grab the shelf that's here, and when I reached to try to get – to reach to the shelf, I missed it, I'm missing the shelf, I can't get it, and I hear a popping sound at this point, but I'm still trying to maintain my balance, but because I missed the self and I'm swaying left to right, it causes me to fall, and when I fell I heard another pop as I'm proceeding to fall, I can hear a popping sound.[13]

Upon falling, Plaintiff Hall called her husband, her sister, and 911.[14] Akron Fire Department paramedics were dispatched at 10:49 am.[15] Two sets of paramedics appeared to aid Plaintiff Hall. Hall recalls,

> When the paramedics lifted me up and put me on the stretcher, that's when I could see colorful candy lying up underneath me and I'm like, thinking to myself, 'Oh, well, that's what I felt.' But that's when I became aware of what it was that actually caused my fall was when I'm getting–got picked up by the paramedic, but no, I didn't see it until that point.[16]

As a result of the fall, Plaintiff Hall "suffered a right ankle fracture, has undergone multiple surgeries, has incurred more than $233,574 in medical expenses, and has been found to be disabled and awarded SSDI by the Social Security Administration."[17]

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[18] The moving party must first demonstrate that there is an absence of a genuine dispute as

---

[13] Doc. 13-5 at 61–62.
[14] *Id*. at 63.
[15] Doc. 13-8 at 7–8.
[16] Doc. 13-5 at 80.
[17] Doc. 23.
[18] *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580 (6th Cir. 2014) (quoting Fed. R. Civ. Pro. 56(a)).

Case No. 1:15 CV 01070
Gwin, J.

to a material fact entitling it to judgment.[19] Once the moving party has done so, the non-moving party must set forth specific facts in the record—not its allegations or denials in pleadings—showing a triable issue.[20] The existence of some doubt as to the material facts is insufficient to defeat a motion for summary judgment.[21] But the Court views the facts and all reasonable inferences from those facts in favor of the non-moving party.[22]

### III. Analysis

Under Ohio law, a plaintiff may prevail in a slip-and-fall negligence claim in one of three ways. As an Ohio appellate court explained,

> The law in the state of Ohio is clear that in order for a plaintiff to recover damages from a slip and fall accident as a business invitee, the following must be established:
> 1. That the defendant through its officers or employees was responsible for the hazard complained of; or
> 2. That at least one of such persons had actual knowledge of the hazard and neglected to give adequate notice of its presence or remove it promptly; or
> 3. That such danger had existed for a sufficient length of time reasonably to justify the inference that the failure to warn against it or remove it was attributable to a want of ordinary care.[23]

Plaintiffs argue that two hazards existed at the time of the fall. First, Plaintiffs allege that Defendant created a fall hazard by its practice of only having one shoe available for customers to try on. Second, Plaintiffs accuse Defendant of allowing candy pieces to remain on the store floor. The Court examines both arguments in turn.

---

[19] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[20] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[21] *Id.* at 586.
[22] *Killion*, 761 F.3d at 580.
[23] *Combs v. First Nat'l Supermarkets, Inc.*, 663 N.E.2d 669, 670 (Ohio Ct. App. 1995) (quoting *Johnson v. Wagner Provision Co.*, 49 N.E.2d 925, 928 (Ohio 1943)).

Case No. 1:15 CV 01070
Gwin, J.

*1) One-Shoe Policy*

Plaintiffs argue that the store's one-shoe display policy constitutes a dangerous condition. Plaintiffs contend that Defendants knew that with a higher heel it would be more hazardous to only have one heel versus two. Plaintiffs point to Betsvina's deposition as proof that the store created a dangerous condition. Betsvina testified, "I would believe it's easier to walk in two shoes than it is one."[24] However, given the context of the evidence presented, this Court agrees with Defendant that Betsvina's testimony is merely a scintilla of evidence that does not create a genuine issue of material fact sufficient to deny summary judgment.

First, there is no evidence that any customer has fallen as a result of wearing only one shoe at Store 597 or any other Shoe Show store in the last fifteen years due to the half-pair anti-theft measure.

More importantly, Plaintiff Hall testified that the half-pair policy was not the cause of her fall:

> It's accurate to say that whatever I stepped on is what caused me to fall because I wouldn't have lost my balance. I wear these shoes I would say almost every day, that type of shoe, so no, I had no problem with my balance. Whatever I stepped on is what caused my balance to be altered, so that's what I would say caused my fall, whatever caused me to become imbalanced, not the shoe itself.[25]

Thus, Hall admits that the half-shoe policy did not play a role in causing her fall.

Further, Plaintiff Hall testified that she was aware of the store's half-shoe policy. Although Hall seems to have testified that her practice was to only request the other shoe when she decided she wanted to buy a particular shoe, Hall also indicated in her testimony that she was aware that she could have requested the other shoe before purchase. When asked if she would try

---

[24] Doc. 13-2 at 53.
[25] Doc. 13-5 at 77–78.

Case No. 1:15 CV 01070
Gwin, J.

on both shoes before buying them when at Shoe Dept., Hall responded:

> No. I—I'm a Military brat and time is of essence to me, so therefore, to—I'm—I like shoes, but I like my shoes to feel a certain way and look a certain way on me, so therefore it would be a complete time waste for me to try and go run someone down on every single pair and I might try on 15 pair of shoes before I decide which one I want to purchase. So, me, on a normal, I try on my shoe. When I get one that I like, that's the one that I take to the counter, and they go and get it so that I can exit out the store.[26]

Although Plaintiff Hall might very well be right that Defendant's half-pair policy is cumbersome and wastes the time of customers, that does not make it a hazardous condition, especially since Hall had the option to ask for the other shoe before trying shoes on.

As such, the argument that Defendant's half-pair policy created a hazardous condition loses.

*2) Candy on Floor*

Plaintiffs also argue that Defendant had constructive notice of the candy on the floor. This Court finds that there is no genuine issue of material fact as to whether Defendants had constructive notice of the candy on the floor.

Under what is generally referred to as a constructive-knowledge theory of liability-Ohio courts "ha[ve] consistently followed *Anaple* [*v. Standard Oil Co.,* 124 N.E.2d 128 (Ohio 1955),*]* and held that evidence of how long the hazard existed is mandatory in establishing a duty to exercise ordinary care."[27]

In *Williams v. Anderson's, Inc.*, the court applied this principle in rejecting the negligence claim of a woman who had slipped and fallen on an orange peel. "To show constructive knowledge," the court stated at the outset, "the invitee must present evidence to show how long

---

[26] *Id*. at 53.
[27] *Combs,* 663 N.E.2d at 671 .

Case No. 1:15 CV 01070
Gwin, J.

the hazard existed."[28] But "[n]otably" in that case, the court added, "appellant did not present any evidence tending to show that any of appellee's employees saw the orange peel on the floor before appellant fell," and "she did not present evidence showing the amount of time that the hazard existed before the fall."[29]

*Harrison v. Andersons, Inc.*, follows the same path. The court granted summary judgment even though an employee saw the hazard-grapes on the floor.[30] "Assuming, as we must for summary judgment purposes, that this employee did notice the grapes prior to appellant's slip, there is simply no evidence regarding how long that employee knew of the grapes prior to appellant's accident."[31]

Here, Plaintiffs offer no evidence indicating that Defendant knew that the candy was on the store floor, and Plaintiffs fail to show that Defendant had constructive notice of the candy. The store had an explicit policy of vacuuming the floors every night, and there is no evidence that the store did not follow this policy the night before the incident.

Further, Betsvina testified that he would arrive at the store two hours before opening every morning and walk the aisles to ensure they were clean.[32] Melinda Ohler also testified to walking the aisles the morning of the incident and not seeing any debris. Plaintiffs point to the testimony of employee Melinda Ohler to argue that Ohler "might not yet have had a chance to do her daily cleaning in the High-Heel Display area" on the day of the incident.[33] However, Ohler

---

[28] *Williams v. Anderson's, Inc.,* No. L-00-1365, 2001 WL 574958 at *1 (Ohio Ct. App. May 25, 2001).
[29] *Id.* *2.
[30] *Harrison v. Anderson's, Inc.,* No. L-99-1368, 2000 WL 819057 (Ohio Ct.App. June 23, 2000).
[31] *Id.* at *2.
[32] Doc. 13-2 at 10.
[33] Doc. 23.

Case No. 1:15 CV 01070
Gwin, J.

testified that she had an "independent memory" of walking the aisles the morning of the incident and finding nothing on the floors or the carpeting.[34] Betsvina also testified that Defendant had a policy of straightening the store throughout the day and walking the store "constantly."[35] Plaintiffs fail to present any evidence demonstrating how long the candy was on the floor.[36]

Moreover, this Court agrees with Defendant that the evidence shows that the candy was an open and obvious condition. Three people testified that they saw the candy from a standing position.[37] And Hall herself testified that she saw the candy when the paramedics lifted her onto a stretcher.[38] Despite Plaintiffs' arguments that the store was poorly lit and the carpet dark, the fact that four individuals testified to seeing the candy renders it clear that the candy was open and obvious.

Plaintiffs' attendant circumstances argument also fails. The main distraction Plaintiff Hall was dealing with at the time was watching her young daughter.[39] Plaintiff Hall's focus on her daughter was an ordinary event or factor of her own making, and thus not an attendant

---

[34] Doc. 13-6 at 10.

[35] Doc. 13-2 at 29–30.

[36] The only definitive evidence Plaintiffs point to is the alleged statements of Antonio Brown. However, these statements are inadmissible hearsay and cannot be considered on summary judgment.

[37] The three individuals are: Raynell Armstrong, Doc. 13-9 at 23, 25; Melinda Ohler, Doc. 13-6 at 42–43; Debra Foyle, Doc. 13-10 at 7–9.

[38] Doc. 13-5 at 80.

[39] "When I sat on that bench and I was trying that shoe on, my focus was making sure that Dyamond was here and in my eyesight so that no one would snatch her up or anything would happen to her. She's my main focus, because like I say, you've got people in and out on both sides in this area, so my focus is at this point, as I'm putting the shoe on, I'm watching her. She needs to be in my eyesight at all times. I don't have time to take a second to look around, I'm focusing on where she's at and what she's going and that she's right here with me because it's people in the aisle shopping for whatever reasons for purses on this end or coming in through this end, so I haven't even looked back here. That was irrelevant to me because I know enough about it to know my mirror to view is here on this wall, so to look behind me or to the side of me was irrelevant to me versus the relevancy of knowing where my daughter is at." Doc. 13-5 at 70–71.

circumstance.[40]

## IV. Conclusion

Plaintiffs have not demonstrated a genuine issue of material fact. For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment.

IT IS SO ORDERED.

Dated: November 12, 2015.                                s/      *James S. Gwin*

                                                                  JAMES S. GWIN
                                                                  UNITED STATES DISTRICT JUDGE

---

[40] *See George v. Kroger Co.*, No. 25552, 2013 WL 3421978, at *5 (Ohio Ct. App. July 3, 2013).